Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STRYKER CORPORATION, HOWMEDICA OSTEONICS CORP., and STRYKER EMPLOYMENT COMPANY, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>BENNY HAGAG and MICROPORT ORTHOPEDICS, INC.,<br><br>    Defendants. | Civil Action No.: 21-12499 (ES) (CLW)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Before the Court are (i) Stryker Corporation, Howmedica Osteonics Corp., and Stryker Employment Company LLC's (together, "Plaintiffs" or "Stryker") motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure ("Rule") 65 (D.E. No. 50); and (ii) Benny Hagag and MicroPort Orthopedics, Inc.'s ("MPO") (together, "Defendants") motion for partial summary judgment pursuant to Rule 56 (D.E. No. 127). Having considered the parties' submissions, and having held two days of oral argument on Plaintiffs' motion for a preliminary injunction, the Court is ready to rule. For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is **DENIED** and Defendants' motion for partial summary judgment is **GRANTED**.

## I.    BACKGROUND[1]

### A.    Factual History

This case, like countless others involving non-compete agreements, involves a senior-level executive's contentious departure from his former employer.  The former employer, Stryker, is a Fortune 500 company and world leader in innovative medical technology, specifically knee and hip orthopedic implants.  (Kroll Decl. ¶¶ 2 & 5).  The former employee, Benny Hagag, held various executive-level positions in Stryker's orthopedic business throughout his tenure.  (*See id.* ¶ 13; Hagag Decl. ¶ 4).

In 2004, roughly ten years before joining Stryker, Hagag co-founded MAKO Surgical Corporation ("MAKO"), a medical device company that specialized in orthopedic implants and assistive surgical robots, specifically, the Mako RIO® Robotic Arm Interactive Orthopedic System (the "Mako System").  (Kroll Decl. ¶ 3; *see* Compl. ¶ 2; Hagag Decl. ¶ 2).[2]  Stryker acquired MAKO in 2013 for $1.65 billion as part of its orthopedics business line.  (Kroll Decl. ¶ 3).  According to Shawn Kroll, Stryker's Vice President of Robotics and Enabling Technology Platforms, the acquisition added the Mako System to Stryker's line of orthopedic products and has

---

[1]    The Court draws the facts from the voluminous record, including Plaintiffs' Complaint (D.E. No. 1 ("Complaint" or "Compl.")); the declarations of Shawn Kroll (D.E. No. 50 ("Kroll Decl.")), Greg Kelly (D.E. No. 50-1 ("Kelly Decl.")), and Akhil Gola (D.E. No. 53 ("Gola Decl.") & D.E. No. 74 ("Gola Supp. Decl.")), including exhibits attached thereto; the declarations of defendant Benny Hagag (D.E. No. 66-1 ("Hagag Decl.")), Todd Smith (D.E. No. 66-2 ("Smith Decl.")), and Kevin Bendix (D.E. No. 68 ("Bendix Decl.")), including exhibits attached thereto; the parties' supplemental submissions as requested by the Court (D.E. No. 93 ("Pls. Supp. Ltr.") & D.E. No. 94 ("Defs. Supp. Ltr.")), including exhibits attached thereto; and witnesses' testimony and counsels' arguments from the hearing held on March 10 and 11, 2022 (D.E. No. 123 ("03/10/22 Tr.") & D.E. No. 125 ("03/11/22 Tr.")).

    The parties cross-examined each other's witnesses during the hearing.  Throughout the proceedings, the Court assessed the witnesses' credibility by observing their demeanor, their ability to recall events, their potential interest, influence or bias, and the consistency of the evidence.  Mr. Kroll appeared to be very credible, including on cross-examination; the record cites herein are consistent with his testimony.  (*See* 03/10/22 Tr. at 90:7–149:14; 03/11/22 Tr. at 170:5–6).  As described more below, the Court found Hagag not credible at various points, particularly when questioned by Stryker's counsel.

[2]    The Court recites the Mako System's full name as stated in the declaration of Shawn Kroll.  Alternative renditions of its name are set forth in Stryker's Complaint and Hagag's declaration.  (*Compare* Compl. ¶ 27 (the "Mako SmartRobotics™ Robotic-Arm Assisted Surgical System"), *with* Hagag Decl. ¶ 2 ("'RIO' or Robotic Arm Interactive Orthopedic System")).

served as the core of Stryker's orthopedics business strategy. (*Id.* ¶¶ 1, 3 & 5). Kroll has been employed at Stryker for over twenty years. (03/10/22 Tr. at 90:1–2).

When Stryker acquired MAKO in 2013, it employed Hagag as a senior-level executive until his departure in 2020. (Kroll Decl. ¶ 13; Hagag Decl. ¶ 2). As MAKO's founder, Hagag knew the intricacies of the Mako System intimately, including its strengths and weaknesses. (Kroll Decl. ¶ 15; *see* D.E. No. 53-1, Ex. 1 to Gola Decl. at 26:19–27:22).

*Hagag's Non-Compete.* When Hagag joined Stryker, he signed an agreement not to compete. (D.E. No. 1-1 ("Non-Compete" or "Agmt.")). Hagag agreed to the following covenant:

> During [Hagag's] employment with Stryker and for a period of twelve (12) months after the termination of [his] employment with Stryker for any reason, [Hagag] will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any **Conflicting Organization** in which the services [Hagag] may provide could enhance the use or marketability of a **Conflicting Product or Service** by application of **Confidential Information** which [Hagag] . . . had access to during [his] employment. . . .

(Agmt. § 6.3(a) (emphasis added)). A "**Conflicting Organization**" is defined, under the Non-Compete as "any person or organization which is engaged in or about to become engaged in research on, consulting, regarding, or development, production, marketing, or selling of a **Conflicting Product or Service** . . . ." (*Id.* (emphasis added)). Moreover, the Non-Compete provided that Hagag could accept employment with a Conflicting Organization "whose business is diversified and which is, as to that part of its business in which [he] accept[s] employment, not a Conflicting Organization." (*Id.*). In the event he accepted employment with a Conflicting Organization, Hagag agreed to "provide Stryker with assurances satisfactory to Stryker that indicate that [he] will not render services directly or indirectly, for a twelve (12) month period following the termination of [his] employment with Stryker for any reason, in connection with any

Conflicting Product or Service." (*Id.*). Hagag "underst[oo]d that Stryker may also require written assurances from the Conflicting Organization," and "agree[d] that during [his] employment with Stryker and for a period of twelve (12) months thereafter, [he] [would] not render services to any organization or person in a position in which [he] could use Confidential Information to the detriment of Stryker." (*Id.*).

The Non-Compete defines a "**Conflicting Product or Service**" as:

> any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which [Hagag] . . . worked or about which [Hagag] was knowledgeable during the last twenty-four (24) months of [his] employment with Stryker.

(Agmt. § 6.1). The Non-Compete provides the following definition for "**Confidential Information**":

> know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by [Hagag] during [his] employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) expansion plans, management policies and other business strategies; (i) inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, engineering, marketing, merchandising, and selling. Confidential Information shall not include information that is or becomes part of the public

> domain, such that it is readily available to the public, through no fault of [Hagag].

(Agmt. § 2.2).  Finally, Hagag acknowledged that his compliance with the Non-Compete and the provisions contained therein were "reasonable and necessary for the protection of the goodwill and continued business of Stryker."  (Agmt. § 7.5).

In the event of a breach, Hagag agreed that Stryker would be entitled to certain remedies. Specifically, the Non-Compete provides that:

> (a) Stryker may seek and obtain injunctive relief in addition to damages Stryker may recover at law, (b) that the period during which Sections 6.2, 6.3 or 6.4 apply to [Hagag] will be deemed to be extended by one (1) day for each day that [Hagag] [is] in breach of Section 6.2, Section 6.3 and/or Section 6.4 of this Agreement, and (c) that Stryker will be entitled to recover from [Hagag] its reasonable attorneys' fees and costs of any action that it successfully brings for [his] breach or threatened breach of this Agreement.  All remedies for enforcement of this Agreement shall be cumulative and not exclusive.

(Agmt. § 8.1).

*The Mako System.*  The Mako System is a surgical robot that is used for orthopedic surgeries, specifically knee and hip implants.  (Kroll Decl. ¶ 5).  It contains a surgical robotic arm that is attached to the base of the device.  (03/10/22 Tr. at 39:17–18).  The Mako System is a "closed system," which means it is made for use with only Stryker's orthopedic implants.  (Kroll Decl. ¶ 6).  It works in conjunction with Computed Tomography ("CT") scans, which produce 3D visuals of a patient's anatomy.  (*Id.* ¶ 4; 03/10/22 Tr. at 39:7–8).  The Mako System analyzes imagery of the patient's body generated by CT scans and creates a pre-operative surgical plan. (Kroll Decl. ¶ 4(a); 03/10/22 Tr. at 92:5–10).  During surgery, the Mako System assists surgeons by (i) guiding them where to cut the patient in accordance with the pre-operative surgical plan, and (ii) providing them with real-time data and refinements to the plan on a screen.  (Kroll Decl. ¶

4(b)–(c); 03/10/22 Tr. 39:9–12 & 92:22–93:1). As Stryker described throughout this case, the Mako System helps surgeons "know more" and "cut less." (*See, e.g.*, Kroll Decl. ¶ 4). As described by Hagag, the Mako System allows "for more accurate robotic-assisted bone cutting, implant positioning, and alignment during surgery." (Hagag Decl. ¶ 2). Kroll testified that a surgeon who uses the Mako System still "controls all of the functionality of the cutting tool." (03/10/22 Tr. at 92:17–19). Patients benefit from their surgeons' use of the Mako System by experiencing less bone and soft tissue damage, less post-operative pain, and an overall shorter recovery period. (Kroll Decl. ¶ 5).

***Hagag's Role at Stryker.*** Hagag left Stryker holding the position of General Manager and Vice President for Stryker's Asia Pacific MAKO business. (D.E. No. 53-2, Ex. 2 to Gola Decl. at 2; *see* Kroll Decl. ¶ 13). In 2017, Stryker assigned Hagag to Hong Kong and he regularly traveled to Korea, China, Taiwan, India, Singapore, Thailand, and Japan. (Hagag Decl. ¶ 7). In this last role, he was principally involved in developing Stryker's orthopedic joint implant sales together with the Mako System, with a focus on the Asia-Pacific region. (Kroll Decl. ¶ 13).

Hagag had many responsibilities during his tenure at Stryker, including marketing, sales, business plan development, involvement in strategic decisions, training and education, pricing strategies, and overall go-to market strategy. (*Id.*). As described by Hagag, he launched "marketing campaigns together with hospitals acquiring robotic systems," met "with government officials and local FDA as needed to promote market access and approvals," and oversaw "market development, penetration strategy and implementation," among other things. (D.E. No. 53-3, Ex. 3 to Gola Decl. at 1–2). As a senior executive, he was involved in executive-level meetings that focused on the future of Stryker's joint-replacement business. (Kroll Decl. ¶ 13).

To fulfill his responsibilities, Hagag necessarily had access to and regularly accessed

Stryker's confidential information. (*Id.* ¶ 14). After Hagag left Stryker, for example, he had documents that contained Stryker's confidential information, including its development process, regulatory approval status and strategy, clinical data, financial and strategic plans, go-to market and pricing strategies, manufacturing and engineering methods, presentations, and lists of consultants, distributors, and customers. (Kroll Decl. ¶ 14; 03/10/22 Tr. at 105:3–18; *see, e.g.*, D.E. Nos. 53-5, 53-6, & 53-7, Exs. 5–7 to Gola Decl.). Because Hagag traveled frequently for work, Stryker permitted him to keep personal files on his company-issued computer, and to regularly backup his entire computer to an external hard drive. (Hagag Decl. ¶ 8).

   ***Stryker's Robotics Development & Augmented Reality Technology.*** In recent years, Stryker has been researching ████████████████████████████████████ ████████████ which make orthopedic surgery and recovery simpler, faster, and more effective." (Kroll Decl. ¶ 3). The Mako System is an integral piece of Stryker's computer-aided surgical offerings. (*Id.* ¶¶ 3 & 5). ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ AR technology combines virtual elements in real space, sometimes by way of a headset or goggles that project digital information in a user's environment. (Kroll Decl. ¶ 9; 03/10/22 Tr. at 100:24–25 ("[I]t's a technology that uses optics to overlay information in the real world.")). One common example of AR technology is the virtual display of information in the windshield of a vehicle, such as the driver's speed, the road's speed limit, and navigational signals. (*See* 03/11/22 Tr. at 66:12–21).

AR technology can play a vital role during orthopedic surgeries.  By wearing a set of virtual goggles, surgeons can see, for example, projected information regarding a surgical plan, such as where to cut a patient's body, as well as graphics depicting a patient's anatomy.  (Kroll Decl. ¶ 9; 03/10/22 Tr. at 101:18–20 (AR "is used to display information about planning, about the surgical workflows, about the patient, [and] maybe the disease")).

Kroll testified



(03/10/22 Tr. at 111:19–113:2).

(Hagag Decl. ¶ 5; 03/11/22 Tr. at 9:17–10:4, 29:3–30:21 & 31:19–32:2).

***MPO & Hagag's Resignation.***    In early 2019, Hagag approached Stryker about advancement opportunities in the United States.  (Hagag Decl. ¶ 9).  Because this discussion appeared unfruitful, Hagag explored other employment opportunities.  (*Id.*).  A recruiter approached Hagag in mid-2019 and connected him with MPO.  (*Id.* ¶ 10).  Discussions between MPO and Hagag began in September 2019, and Hagag informed MPO about his Non-Compete with Stryker.  (*Id.*).  On November 7, 2019, Hagag signed an employment agreement with MPO, in which he agreed to become MPO's President.[4]  (D.E. Nos. 53-17 & 53-18, Exs. 17 & 18 to Gola Decl.).

MPO is a direct competitor to Stryker as the sixth largest multinational hip and knee

---

[3]    Virtual reality ("VR") technology is not integral to the parties' dispute.  In any event, VR technology is an entirely virtual space made possible, for example, by goggles that portray a complete digital display of three-dimensional information.  (03/11/22 Tr. at 67:6–15).

[4]    The agreement provides that MPO will indemnify Hagag for "matters arising under or related [to] any restrictive covenants [Hagag] currently performs under."  (D.E. No. 53-17, Ex. 17 to Gola Decl. at 9–10).

orthopedic reconstruction business.  (Kroll Decl. ¶ 11).  According to Todd Smith, MPO's Vice President of Finance, the company produces knee and hip orthopedic products.  (Smith Decl. ¶¶ 3 & 4).[5]  It is headquartered outside of Memphis, Tennessee.  (*See* D.E. No. 53-3, Ex. 3 to Gola Decl. at 1; 03/11/22 Tr. at 103:16–17).  MPO targets smaller hospitals and doctors that do not use orthopedic surgical robots.  (Smith Decl. ¶ 4).  MPO's parent company is MicroPort Scientific Corporation ("MPSC").  (*Id.* ¶ 5).  MPSC develops and manufactures a variety of medical devices globally.  (*Id.*).

Glendy Wang oversaw MPO's recruitment and hiring of Hagag.  (D.E. No. 53-31, Ex. 30 to Gola Decl. ¶ 1).  Hagag states that as of April 2020, Ms. Wang served as a member of MPO's Board of Directors.  (Hagag Decl. ¶ 38).  Although Ms. Wang did not disclose her position in an April 23, 2020 letter to Stryker, the record indicates that she serves as MPSC's Chief Operating Officer.  (D.E. No. 53-20, Ex. 19 to Gola Decl. at 1; 03/10/22 Tr. at 162:8–10).  Hagag testified that Wang served as his first boss and he reported directly to her.  (03/10/22 Tr. at 157:13–15 & 162:11–12).

On January 1, 2020, Hagag informed Stryker of his resignation, effective February 1, 2020.  (D.E. No. 53-23, Ex. 22 to Gola Decl.).  Hagag did not disclose his new employer to Stryker.  (Compl. ¶¶ 59 & 60; D.E. No. 53-25, Ex. 24 to Gola Decl.; D.E. No. 66-4, Ex. J to Bendix Decl. at 1).  Before leaving Stryker, Hagag asked an individual in Human Resources whether he should abide by any exit procedures.  (Hagag Decl. ¶ 15).  Hagag was informed that no such procedures existed.  (*Id.*).  In accordance with Stryker's policy that allowed employees to purchase their company-issued phones after two years, Hagag asked Stryker if he could purchase his company-

---

[5]     Smith testified that in addition to financial functions, he participates in executive strategic discussions and is a member of the Intercontinental Orthopedic Committee, which oversees the company's orthopedic division.  (03/11/22 Tr. at 104:2–10).

issued phone. (*Id.*). Because Hagag's iPhone was valued at $50.00, Stryker permitted him to keep it at no cost. (*Id.* ¶ 17). Hagag maintains that before his departure, Stryker never requested his external storage devices and did not assist him with deleting his personal files from his company-issued computer. (*Id.* ¶ 18).

    ***MPSC & MPO's Robotics Development & Augmented Reality Technology.*** On January 22, 2019, approximately one year before MPO hired Hagag, MPSC and MPO officers held a regular meeting of the "Intercontinental Orthopedics Committee of MicroPort Scientific Corporation." (D.E. No. 53-20, Ex. 19 to Gola Decl. at 1). Under a topic entitled "Research and Development" the minutes reflect that Paul Bryant, MPO's Chief Technology Officer ("CTO"),

███████████████████████████████████████████████

████████████ (*Id.* at 2). Jonathan Chen, MPSC's Chief International Business Officer, ██████

███████████████████████████████████████████████

████████████ (*Id.*). This discussion appears to have involved a surgical robot called "SkyWalker," which allegedly entered the Chinese National Drug Administration's "Green Channel" program in May 2020. (Compl. ¶ 11; *see id.* ¶¶ 92–94 & 109). Counsel for MPO conceded that the SkyWalker robot "essentially does the same thing as the Mako [System]." (03/10/22 Tr. at 76:2–3). Thus, there is no dispute that the SkyWalker robot is a competing product to the Mako System. (03/10/22 Tr. at 61:9–10 & 75:13–15).

    Apart from SkyWalker, MPO has explored advanced assistive surgical technologies to visually aid and train doctors for surgeries. (Smith Decl. ¶ 11). For example, through a partnership with Pixee Medical ("Pixee"), MPO explored AR goggles that "project images onto a surgeon's view of the operative field to assist the surgeon during surgery." (*Id.*). These AR goggles can be used "while performing **either traditional *or robotic cutting***, depending on the surgeon's

preference." (*Id.* (emphasis added)).  MPO also explored ████████████ and ████████████, which can be used ████████████████████ for preoperative planning. (*Id.* ¶¶ 11 & 12).  MPO states that these technologies are meant "to assist surgeons with simplifying, training for, and planning surgeries, but are not used to perform actual surgical procedures such as cutting or bone preparation." (*Id.* ¶ 12).

In MPO's view, AR assisted surgical technologies "are designed to be complementary with the use of robotics (if the surgeon desires)." (*Id.* ¶ 11; *id.* ¶ 12 (categorizing these technologies as "complementary (not competitive) with robotic and traditional surgical approaches")).  Smith further maintains that these technologies are not "substitutes for robots." (*Id.*).  In other materials, MPO characterizes ████████████████████████████ (*see, e.g.*, D.E. No. 53-43, Ex. 40 to Gola Decl. at 43), which Hagag describes as products that are "actually in a different market, and accordingly, do not compete." (Hagag Decl. ¶ 32).  MPO made this characterization as early as December 2018 in a presentation depicting its five-year plan. (D.E. Nos. 53-41 & 53-43, Ex. 40 to Gola Decl. at 1 & 43).

However, in MPO's documentation it compares ████████████████████████ ████████████████████ (*See, e.g.*, D.E. No. 53-43, Ex. 40 to Gola Decl. at 43).  This imagery is depicted below, under the heading ████████████:



(D.E. No. 53-40, Ex. 39 to Gola Decl. at 5 (January 2019 MPO Slide Deck entitled "███████ and Shoulder Slider") (emphasis added)).  On the preceding page of the presentation, MPO includes images of Stryker's Mako System as the "[m]arket leader" under the "Main Players" in the robotics market:



(*Id.* at 4).  In January 2021, an MPO slide deck described "███████████████████████████" along with its "████████" in the company: "████████████████████████████████████████████████████████████████████████████████████"

(D.E. No. 74-1, Ex. 51 to Gola Supp. Decl. at 15 (emphasis added)).  Similarly, a presentation

deck authored by Pixee found in Hagag's files depicts a slide entitled "," which



(D.E. No. 74-5, Ex. 55 to Gola Supp. Decl. at 12).

**Hagag's Work at MPO.** In his role as MPO's President, Hagag and MPO insist that he

has not been involved in any research, consultation, development, production, marketing, or sale

of orthopedic surgical robots. (Hagag Decl. ¶ 34; Smith Decl. ¶ 9). Hagag further claims that

MPO does not "produce, market, or sell an orthopedic surgical robot anywhere in the world, nor

is MPO researching, consulting on, or developing one." (Hagag Decl. ¶ 34; *see* Smith Decl. ¶ 9).

According to Smith, "MPO ceased all of its

and erected a screen between MPO and other MicroPort entities, including MPSC,

concerning the topic of orthopedic surgical ." (Smith Decl. ¶ 8). Smith later clarified that

13

he had no knowledge of (i) any limitations placed on Hagag's access to MPO documents, (ii) any firewalls in place to prevent Hagag's access to restricted files, or (iii) any policies or processes in place to remove Hagag from email communications or meetings in light of his Non-Compete. (D.E. No. 74-6, Ex. 56 to Gola Supp. Decl. at 153:4–24; 03/11/22 Tr. at 118:23–119:11 (confirming that there were no "firewalls" or "formal processes" at MPO to enforce the guidelines it circulated with respect to Hagag's Non-Compete)).

Smith admits that MPO "developed a regulatory strategy and obtained the FDA's approval for the first MPO ███ 510(k) submission plan . . . that was performed in 2019, before Hagag joined MPO." (Smith Decl. ¶ 14; 03/11/22 Tr. at 126:2–6). MPSC spearheaded this robot, coined SkyWalker, in China. (See 03/10/22 Tr. at 74:20–23; 03/11/22 Tr. at 133:17–19). MPO maintains that it stopped all work on this 510(k) submission plan after Hagag's hiring. (Smith Decl. ¶ 14).

The parties dispute Hagag's involvement in robotics at MPO. Although it is undisputed that Hagag participated in AR assisted surgical technologies at MPO, the parties disagree as to whether his conduct in this regard violates his Non-Compete. The Court summarizes the pertinent evidence here.

In **January 2020**, Hagag drafted notes for a "[m]eeting with Glendy [Wang]." (D.E. No. 53-50, Ex. 47 to Gola Decl. at 4). Under a heading entitled "███ *program*" Hagag listed the following topics for discussion:

> Plans and expectations
> Development status
> Regulatory
> Clinical experience
> Organization plans
> Investment
> Sales organization and sales objectives (Cash, TVA, Rental,
> Loaner in exchange for business…)
> Training
> Service

Logistics

(*Id.* at 4–5 (emphasis added)).  Hagag maintains he never spoke to Wang about robotics during

this meeting.  (03/10/22 Tr. at 160:13–14).

On **February 21, 2020**, Paul Bryant, CTO at MPO, drafted notes for an "Advanced Tech

Program Discussion."  (D.E. No. 53-35, Ex. 34 to Gola Decl.).  Bryant recognized Hagag's Non-

Compete and notes that under the non-solicitation provision, Hagag "[c]an not get Stryker

customers or employees—unless they already left Stryker." (*Id.* at 1).  Furthermore, he stated that

"Benny knows surgeons [within] Stryker's accounts" and that "he can still have relations [with]

his network." (*Id.*).  The notes also reflect that there would be "no issue" with "███████" advanced

technologies. (*Id.*).

On **March 17, 2020**, Hagag exchanged "WeChat Messages" with Glendy Wang.  (D.E.

No. 53-51, Ex. 48 to Gola Decl.).  Hagag wrote:

> Hi Glendy. I'm sharing with you the contact information for Dr
> FREDERICK BUECHEL JR. This is the surgeon I mentioned about
> yesterday who can help with shoulder and partial knee implants[.] .
> . .
>
> This is Dr BUECHEL He's [sic] business card. As you can see *he
> is also an expert in robotic surgery. I can attest to this claim. He is
> one of the best I know for robotic PKA.* His father is a very famous
> surgeon. Many of the Sr surgeons in China will recognize his name.
> He used to travel to Asia frequent[ly] to train surgeons[.]

(*Id.* at 3 (emphasis added)).  On **March 22, 2020**, Wang responded to Hagag:

> Hi Benny: I have a good conversation with Dr Buechel, there are
> two follow ups from my side: one is to organize a con call *to connect
> MicroPort* ████ *and him, to get his input from an user's
> perspective.* [ ] Benny please to review his father's design/IP, in case
> it can be accelerate product availability, fulfill the gap. It was a great
> talk with him, thank you Benny for connecting us. [sic]

(*Id.* (emphasis added)).  Two minutes later, Hagag replied:

15

I'm happy to hear that this connection worked well[.] *[I']ll follow [up] with Dr Buechel on the IP[.] He can be an excellent resource for us on both the* ████ *team* and for implants that we commercialize in the future[.] [H]e is also the best clinical trainer as a surgeon that I know. I'm not sure if I mentioned but ████ ████████████████████████████████████ (301, #6...) *and he is still in contact with many of the surgeons.*

(*Id.* at 4 (emphasis added)).  Wang responded: "he is looking forward to continuously work[ing] with you and MicroPort." (*Id.*).  Hagag replied:

Happy to hear[.] *[H]e can help us with bringing these surgeons to our camp as soon as the borders open again*[.]  [A]s he said, I have been working with him for many years and I consider him as a personal friend. *Together we can build a great program in China, Asia and the US*[.]

(*Id.* (emphasis added)).  Wang responded with two "thumbs up." (*Id.*).

On **March 30, 2020**, Hagag wrote again to Wang:

I had a good call with Dy Buechel [sic] yesterday. I'll still have some follow up this week with him to go over some further details. *We should have a call sometime during the day to discuss plans and strategy*[.]

(*Id.* (emphasis added)).  Wang responded by telling Hagag to "feel free to set the call." (*Id.* at 5).

On **March 31, 2020**, Hagag received an email, forwarded from Robin McCord, stating that "Microport ████ business is now establishing ████████████ and planning ████ ████, so we need your support on local hiring." (D.E. No. 66-3, Ex. F to Bendix Decl.). Hagag stated that MPO "didn't know about it" and "can[']t support it due to [his] non-compete." (*Id.*).  Robin replied, "[p]erhaps the message didn't get to HR *from Glendy*." (*Id.* (emphasis added)).  In response, MPO's in-house counsel attached an internal memorandum that outlined the steps MPO needed to take to ensure compliance with Hagag's Non-Compete. (*Id.*).  Counsel noted "[Hagag] is to have no involvement in the development of surgical ████." (*Id.*).

On **May 6, 2020**, Hagag exchanged several messages with Jonathan Chen, MPSC's Chief

International Business Officer, regarding Magic Leap. (D.E. No. 53-44, Ex. 41 to Gola Decl.). Magic Leap, like Pixee, designs and manufactures AR goggles. (03/10/22 Tr. at 86:3–4 & 103:10–12). Chen sent Hagag an article stating that "Zimmer is rumored to be the HC company that will invest $100M in Magic Leap." (D.E. No. 53-44, Ex. 41 to Gola Decl. at 1). Hagag responded: ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████ (03/10/22 Tr. at 98:19–22).

On **August 5, 2020**, in response to an email from a talent agency, Hagag stated: "We are currently not working [on] the development of [a] ███ platform in our US facility. Our parent company has a different team in China that is focused on medical ███ as a separate core competency of Microport Scientific which will eventually also support orthopedic." (D.E. No. 66-3, Ex. G to Bendix Decl.).

On **October 21, 2020**, Hagag received an email regarding the Pixee and MPO Pilot Program from Bryant. (D.E. No. 53-47, Ex. 44 to Gola Decl.). A document attached to that email entitled "Pixee Medical and MicroPort Orthopedics ███ Navigation Pilot Program" lists goals under the heading "Intent of the Pilot Program." (*Id.* at 3). The following questions are posed under the first sub-heading "[t]echnology valuation":

- *Can the technology be used to leverage against* ███ or other technologies in the market. What is the effectiveness?
- *How marketable is this technology compared to* ███ or other technology?

(*Id.* (emphasis added)). Next, the document lists inclusion criteria for pilot users, including: "*[e]xisting users targeted by* ███ *technology*," and "*[c]ompetitive users targeted by*

17

▮▮▮▮/*technology*.''    (*Id.* at 4 (emphasis added)).    MPO's role included "[d]etermin[ing]/recruit[ing] specific sites for trial (covering various user types)'' and "[o]ngoing customer sales/service support throughout the pilot program.''  (*Id.*).  The document further lists "Success Metrics of the Pilot Program'' which includes the "*[a]bility to fend-off competitive technology threats (e.g.,* ▮▮▮▮*)*.''  (*Id.* (emphasis added)).

On **January 20, 2021**, Hagag emailed two MPO individuals, including Smith, with an attachment entitled "Annual work report [ ] 2020 Work Summary.''  (D.E. No. 53-36, Ex. 35 to Gola Decl. at 2).  There, under the key performance indicators for "operational effectiveness,'' Hagag wrote: "Develop a regulatory strategy and obtain the FDA's approval for the first MPO ▮▮▮▮ 51ok [sic] submission plan.''    (*Id.*).    Directly beneath it appears: "*Actual completion: Successfully completed the FDA Q-submission with the FDA's acceptance of the proposed testing plan.*''  (*Id.* at 3).

In **March 2021**, Hagag wrote to MPO employees, stating that its partnership with Pixee "continues to thrive.''  (D.E. No. 53-38, Ex. 37 to Gola Decl.).  He noted that trial surgeons were enthusiastic about this technology because of "its potential to become a cost-effective and user-friendly alternative to ▮▮▮▮.''  (*Id.*).[6]  That same month, in a draft presentation deck on MPO's advanced technologies (circulated to Hagag), it includes excerpts of surgeons' feedback, such as: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.''  (D.E. No. 53-48, Ex. 45 to Gola Decl. at 6 (noting that there was ▮▮▮▮▮▮▮▮ and that Pixee is and ▮▮▮▮▮▮ and a ▮▮▮▮▮▮▮▮) (emphasis added)).

On **July 5, 2021**, Hagag published an article entitled "Survival instinct – it's in the bones.''

---

[6]    Although Hagag skirted whether he held this belief on the witness stand, he eventually conceded that he authored this statement.  (*See* 03/10/22 Tr. at 168:5–169:7 & 170:17–171:2).

(D.E. No. 53-39, Ex. 38 to Gola Decl.). There, he states that MPO's focus on "new technological alternatives" would require less hospital investments and deliver "the same, if not better, clinical outcomes as expected from robotics." (*Id.* at 6).

*Stryker & MPO Discussions.* Between January 2020 and March 2021, Stryker and MPO engaged in lengthy discussions regarding Hagag's role at MPO, his electronic devices, Stryker's confidential information, and MPO's endeavors in the robotics space.

On **January 29, 2020**, MPO informed Stryker that Hagag would serve as its President and that Defendants intended to comply with Hagag's Non-Compete. (D.E. No. 53-26, Ex. 25 to Gola Decl. at 1). Hagag started as President of MPO on February 3, 2020. (Hagag Decl. ¶ 11).

On **February 26, 2020**, Stryker contacted MPO to request that Hagag return all of his electronic devices and acknowledged that "Hagag's role, on its face, is inherently competitive with his former role at Stryker" because as MPO's President "he will be influencing and setting strategy for orthopedic implant sales to the *identical customer base* with whom he worked and developed strong relationships while employed by Stryker." (D.E. No. 66-4, Ex. J to Bendix Decl. at 1). Moreover, Stryker noted its suspicion that MPO had a robotics platform under commercial development, which made Hagag an attractive candidate. (*Id.* at 1–2). Hagag and MPO sent his devices to Stryker overnight. (Hagag Decl. ¶ 35).

On **March 1, 2020**, MPO circulated an internal memorandum detailing the terms of Hagag's Non-Compete and providing guidelines for interaction with Hagag. (D.E. No. 53-32, Ex. 31 to Gola Decl.; 03/11/22 Tr. at 116:23–118:16). Among other guidelines, MPO advised that Hagag should not be "involve[d] . . . in any discussion of products *competitive* with Mako's. . . . Even though MPO is not currently developing a surgical robot, discussing ideas related to a surgical robot may violate his non-compete." (D.E. No. 53-32, Ex. 31 to Gola Decl. at 1 (emphasis

added)).

On **March 6, 2020**, MPO emailed Stryker a list of passwords for Hagag's devices.  (D.E. No. 66-4, Ex. K to Bendix Decl.).

On **April 7, 2020**, Stryker wrote to MPO stating that despite MPO's assurances, Stryker had "commissioned a forensic examination of Mr. Hagag's Stryker-issued laptop" and learned that "hundreds of files containing Stryker information were copied or downloaded to, or exist on, [ ] external devices" that "were connected to the laptop in the weeks and days immediately preceding [ ] Hagag's departure from Stryker."  (D.E. No. 53-27, Ex. 26 to Gola Decl. at 2).  Stryker stated that the information included, among other things, Stryker's "marketing, sales, clinical, training, and consultant information and strategic business documents" many of which are "highly confidential and directly related to Stryker's robotics."  (*Id.*).  Based on this information, Stryker believed that the assurances it had received were "false and that Mr. Hagag [ ] misappropriated proprietary, confidential and highly sensitive Stryker property and business information . . . in violation of his obligations under the Agreement."  (*Id.* at 1–2).  Stryker demanded Hagag's external storage devices and additional written assurances.  (*Id.* at 2).

On **April 14, 2020**, Vestige Digital Investigations ("Vestige") received Hagag's three external storage devices.  (Kelley Decl. ¶ 9).  Vestige could not access one of the three devices, notwithstanding a good physical appearance and no indication of damage from transit.  (*Id.* ¶ 10).  Upon disassembling the device, Vestige personnel observed that the hard drive platters were shattered.  (*Id.* ¶ 11 (including photograph)).  Greg Kelley, Chief Technology Officer of Vestige, concluded that based on his experience, "someone intentionally destroyed the hard drive platters" and that "this type of destruction of the hard drive could not have been accidental."  (*Id.* ¶¶ 1 & 12).  This was especially so because "the box in which this hard drive was shipped arrived without

any sign of external damage" and the device's external casing "was void of any damage." (*Id.* ¶ 12). Kelley also notes that Google searches for hard drive destruction can teach any individual to destroy hard drive platters in this manner. (*Id.*).

As it relates to Hagag's other devices, Kelley confirmed that a Samsung device had Stryker files copied to it in January 2020. (*Id.* ¶ 13). In addition, Kelley reported that Vestige could not access any user data from Hagag's iPad, which had been reset to its factory settings on February 25, 2020. (*Id.* ¶ 14). And while Hagag's iPhone had some data on it, messages were set to delete automatically after thirty days. (*Id.*). Kelley noted that both the platter damage and the wiped iPad made it impossible to determine whether any data had been transferred or copied to another device or server before Vestige received them. (*Id.* ¶ 15). Hagag insists that he did not intentionally damage the external storage device with shattered platters, and that he never transferred Stryker files to any MPO device, system, or network. (Hagag Decl. ¶ 37; 03/11/22 Tr. at 25:8–10).

On **April 28, 2020**, Stryker reported these forensic findings to MPO, stating that Hagag "apparent[ly] attempt[ed] to destroy highly relevant evidence" and that his "conduct since the inception of this matter has raised additional red flags." (D.E. No. 66-4, Ex. M to Bendix Decl. at 1–2). Indeed, Stryker stated that the destruction of one device was "extremely concerning to Stryker given the sensitive information Mr. Hagag appears to have stored on the device." (*Id.* at 1). Stryker demanded that MPO submit to a third-party audit, provide more assurances from MPO and Hagag,[7] and that Hagag be placed on sabbatical or administrative leave. (*Id.* at 2). Stryker

---

[7]    Although Stryker asserted that it had not received the assurances requested in its April 7 correspondence (D.E. No. 53-27, Ex. 26 to Gola Decl. at 2), the record reflects that Hagag and Wang, on behalf of MPO, signed assurances on April 23, 2020. (D.E. Nos. 53-30 & 53-31, Exs. 29 & 30 to Gola Decl.). In particular, Wang acknowledged that before hiring Hagag, MPSC "was already in development of its own ███." (D.E. No. 53-31, Ex. 30 to Gola Decl. ¶ 5). She insisted, however, that the division operated as a "separate business unit of a diversified enterprise" and that Hagag had not been hired "to be involved in any way with that separate and independent development of a potential ███ for use in surgery." (*Id.*).

warned that it would be "prepared to pursue litigation" against the Defendants.  (*Id.*).

On **May 1, 2020**, MPO responded to Stryker.  (D.E. No. 66-4, Ex. P to Bendix Decl.).  It apologized about the damaged hard drive, but made clear that Hagag denied intentional destruction and the improper copying of files.  (*Id.* at 1 (claiming that Hagag "attempt[ed] to copy his personal information" and "swept up information that should not have been copied"); 03/11/22 Tr. at 25:8–10).  MPO also explained that Hagag's iPad had been reset because it contained "years of personal information and direct access to his personal accounts that Mr. Hagag was unwilling to turn over to Stryker."  (*Id.*).  Furthermore, MPO noted that it had initiated "the process of engaging an independent third party" auditor and that it would inform Stryker after the completion of an examination.  (*Id.* at 2).  MPO refused to remove Hagag from his position, stating that it would be "unnecessary and disproportionate to the potential risk involved."  (*Id.*).

On **May 5, 2020**, Stryker responded.  (D.E. No. 66-4, Ex. Q to Bendix Decl.).  It stated that Wang's admission regarding the development of a robot by MPO's parent, MPSC, was "extremely concerning" because it had been informed that MPO "had no plans to enter the ███████ market" and that such plans, if any, ceased after Hagag's onboarding.  (*Id.*).  Stryker requested more information as to MPO's screening procedures.  (*Id.*).  With respect to a third-party audit, Stryker made clear that the selection and processes would be a joint effort, indicating that information should be preserved "in the event of future litigation."  (*Id.*).

On **May 8, 2020**, MPO replied.  (D.E. No. 53-33, Ex. 32 to Gola Decl.).  It assured Stryker that it did not have its confidential information and noted that it retained ███████████.  to conduct an independent audit of MPO's systems and Hagag's devices.  (*Id.* at 1).  MPO clarified that MPSC "focuses its sales, marketing and research and development efforts on the Chinese market," which are "completely separate from their counterparts in the United States."  (*Id.*).  It

further noted that besides an international executive committee, of which Hagag was not a voting member, MPO and MPSC do not overlap. (*Id.* at 2). MPO insisted that it never took any steps—from discussions to research and development—to enter the orthopedics ███ market. (*Id.*). It did, however, admit that prior to Hagag's arrival, it evaluated MPSC's ███ prototype and determined that it was not commercially viable in the United States. (*Id.*).

From **May to August 2020**, the parties "communicated regularly, including with a vendor that was retained to perform the audit analysis." (Pls. Supp. Ltr. at 2). Despite Stryker's explicit concerns, it maintains that "Defendants' assurances and promises, in conjunction with Hagag's return of his devices and Defendants' willingness to submit to a third-party audit, provided Stryker with sufficient assurance not to litigate at that time." (*Id.* at 3). Thus, in May 2020, Stryker "shifted its focus to ensuring that all of its information had been returned and settling the remaining disputes." (*Id.*).

On **July 10, 2020,** ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ (*Id.*). Roughly nine months later, a few revelations spurred a change of course. For example, at some point Stryker learned that, in his new role as President of MPO, Hagag had been soliciting Dr. Frederick Buechel, Jr., a top-level, exclusive Mako consultant. (Compl. ¶ 12). It also learned, in April 2021, that MPO or an affiliate had been recruiting a Boston team to develop SkyWalker for the United States market, and that it had been soliciting orthopedic surgeons to engage in studies to assess the robotic system's performance. (*Id.* ¶¶ 97–97 & 109; Pls. Supp. Ltr. at 4).

From **March 2021 to June 2021**, before Stryker filed this lawsuit, it sent MPO eight emails that went unanswered. (Pls. Supp. Ltr. at 4). Those emails are dated March 30, April 5, April 12,

May 4, May 7, May 12, May 18, and May 28, 2021.  (*Id.* (citing D.E. Nos. 93-4, 93-5 & 93-6, Exs. 4–6)).

      **B.**     **Procedural History**

      On June 14, 2021, Stryker filed this lawsuit.  (Compl.).  Ten days later, the parties entered a stipulated preliminary injunction prohibiting Defendants' use, disclosure, transmittal or distribution of Stryker's alleged confidential information for the duration of this litigation or until further order by the Court.  (D.E. No. 16).  Defendants answered on August 12, 2021, and the parties engaged in expedited discovery through October 29, 2021, per stipulation.  (D.E. Nos. 25, 31 & 32).  Nearly five months after initiating this action, Stryker filed the instant motion for a preliminary injunction.  (D.E. No. 50).  The parties briefed the motion in due course.  (D.E. No. 51 ("PI Mov. Br."); D.E. No. 66 ("PI Opp."); D.E. No. 77 ("PI Reply")).  Defendants separately moved to dismiss the matter for lack of venue, which the parties briefed alongside the motion for a preliminary injunction.  (D.E. Nos. 59, 60, 62 & 75).  On January 21, 2022, the Court set oral argument on both motions for March 1, 2022.  (D.E. No. 81).

      Four days prior to oral argument, on February 24, 2022, Stryker's counsel wrote to the Court, expressing an intent to solicit live testimony from Shawn Kroll and its preference to call defendant Hagag.  (D.E. No. 85).  Defendants did not intend to produce Hagag in response to Stryker's eleventh-hour request and noted that Stryker never identified any witnesses it intended to call during prior discussions between counsel.  (*Id.* at 2).  Defendants expressed their desire to move forward with a hearing on the evidentiary record as scheduled.  (*Id.* at 2–3).  The Court promptly conferenced the parties, and they elected to produce live witnesses with a few more days to prepare.  (D.E. No. 89 & 90).  The Court also ordered the parties to submit supplemental letter briefs on the issue of irreparable harm, specifically as it relates to Stryker's delay in seeking

judicial intervention.  (D.E. No. 90; *see* Pls. Supp. Br. & Defs. Supp. Br.).[8]

Oral argument took place on March 10 and 11, 2022.  (D.E. Nos. 119 & 120; *see* 03/10/22 Tr. & 03/11/22 Tr.).  The Court heard live testimony from Mr. Kroll, Mr. Hagag, and Mr. Smith.  (*See* D.E. No. 95).  At the conclusion of oral argument, the Court granted Defendants' request for leave to file a partial motion for summary judgment on the issue of whether Stryker can seek a one-year injunction now, as a remedy under Section 8.1(b) of Hagag's Non-Compete.  (03/11/22 Tr. at 226:22–234:23).  Defendants' partial motion for summary judgment is fully briefed.  (D.E. No. 128 ("SJ Mov. Br."); D.E. No. 134 ("SJ Opp."); D.E. No. 137 ("SJ Reply")).

## II.    LEGAL STANDARDS

### A.    Preliminary Injunction

A preliminary injunction is an "extraordinary remedy and should be granted only in limited circumstances."  *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotations omitted).  To obtain a preliminary injunction, the movant must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Id.*

The Third Circuit has held that the movant bears the burden of establishing "the threshold for the first two 'most critical' factors."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  *Id.*; *accord ADP, Inc. v. Levin*, No.

---

[8]    On March 8, 2022, two days before the revised date for oral argument, Defendants withdrew their motion to dismiss for lack of venue.  (D.E. Nos. 114 & 115).

21-2187, 2022 WL 1184202, at *1 (3d Cir. Apr. 21, 2022). Furthermore, "[a] district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing." *Scanvec Amiable, Ltd. v. Chang*, 80 F. App'x 171, 176 (3d Cir. 2003) (internal citations omitted); *see also Elliott v. Kiesewetter*, 98 F.3d 47, 53 (3d Cir. 1996).

### B. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Rather, the opposing party must prove that there is a genuine dispute of a material fact. *Id.* at 247–48. An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light

26

most favorable to the nonmoving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## III.   DISCUSSION

### A.   Stryker's Motion for a Preliminary Injunction

#### 1.   Likelihood of Success on the Merits – Breach of Contract (Hagag)

To establish a likelihood of success on the merits, Plaintiff must show that it is significantly better than negligible, but not necessarily more likely than not, that it will win on the merits of its claims. *Reilly*, 858 F.3d at 179; *Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 340 (3d Cir. 2019). To establish a claim for breach of contract under New Jersey law, a party must show "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."[9] *Touzot v. ROM Dev. Corp.*, No. 15-6289, 2016 WL 1688089, at *7 (D.N.J. Apr. 26, 2016) (citing *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). For the reasons discussed below, the Court finds that Stryker is likely to succeed on its breach of contract claim.

##### a.   The Existence of a Valid & Enforceable Contract

First, to succeed on a claim for breach of a non-compete agreement, the movant must show that the agreement is an enforceable contract. The test for enforceability is one of reasonableness. *Comet Mgmt. Co. v. Wooten*, No. A-1892-17T1, 2020 WL 897973, at *5 (N.J. Super. Ct. App. Div. Feb. 25, 2020). It "requires the court to determine whether: '(1) the restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public.'" *Id.* (citing *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005)); *HR Staffing Consultants LLC v.*

---

[9]     There is no dispute that Stryker would be entitled to damages if a breach occurred, and that Stryker performed its contractual obligations under the Non-Compete. Thus, the Court confines its analysis to the first two factors.

*Butts*, 627 F. App'x 168, 171 (3d Cir. 2015).

### i.    Employer's Legitimate Interests

In evaluating an employer's legitimate interests, courts consider the need to protect "trade secrets or proprietary information," "customer relationships," and any other "highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment." *ADP, LLC v. Kusins*, 215 A.3d 924, 943 (N.J. Super. Ct. App. Div. 2019) (internal citations omitted). There is no legitimate interest in "preventing competition or preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry." *Ethicon, Inc. v. Randall*, No. 20-13524, 2021 WL 2206106, at *20 (D.N.J. May 28, 2021) (first quoting *Kusins*, 215 A.3d at 943; and then quoting *ADP, LLC v. Lynch*, No. 16-1111, 2020 WL 1922590, at *16 (D.N.J. Apr. 21, 2020)) (cleaned up).

As detailed below, Hagag undoubtedly had access to Stryker's confidential information and fostered key surgeon-customer relationships throughout his seven-year tenure at the company. Hagag's exposure to and knowledge of strategic planning information, confidential information, and customer relationships warrants Stryker's need for the Non-Compete. *See, e.g.*, *ADP, LLC v. Rafferty*, 923 F.3d 113, 123 (3d Cir. 2019); *HR Staffing*, 627 F. App'x at 172 (citing *Ingersoll–Rand Co. v. Ciavatta*, 542 A.2d 879, 888 (N.J. 1988)); *see also Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 212–13 (D.N.J. 2009) (rejecting defendant's attempt to minimize his "exposure to strategic planning information" and the "competitive importance of information that he received" while employed by plaintiff, concluding that he was "exposed to a considerable amount of highly sensitive competitive information"). Accordingly, Hagag's Non-Compete is

necessary to protect Stryker's legitimate interests.

## ii.    Undue Hardship

Under the undue hardship prong, courts must determine whether the employee is likely to find work in his or her field under the employment restrictions in place. *HR Staffing*, 627 F. App'x at 172; *Ethicon*, 2021 WL 2206106, at *21.   Where, as here, an employee terminates its relationship with its employer, "the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." *Sumbelt Rentals, Inc. v. Love*, No. 20-17611, 2021 WL 82370, at *18 (D.N.J. Jan. 11, 2021); *HR Staffing*, 627 F. App'x at 172 (finding no undue hardship where defendant "brought any hardship upon himself" after voluntarily ceasing his employment with plaintiff and joining a competitor (quoting *More*, 869 A.2d at 895)).   Furthermore, courts in this district have held that no undue hardship exists when a non-compete agreement provides "some flexibility, such as working for a competitor in a non-competitive role." *See Sumbelt*, 2021 WL 82370, at *18.

The Court is not persuaded that Hagag's compliance with his Non-Compete would result in undue hardship.   First, the fact that Hagag voluntarily parted ways with Stryker to join MPO weighs against undue hardship.    Second, Hagag's ability to secure employment appears unhindered.   Third, the Non-Compete does not bar Hagag from accepting employment with a competitor, provided that he (i) works in a diversified part of the competitor's business, which does not conflict with Stryker's business, and (ii) submits written assurances to Stryker, indicating that he "will not render services directly or indirectly, . . . in connection with any Conflicting Product or Service."   (Agmt. § 6.3(a)).    Indeed, MPO implicitly acknowledged the flexibility offered by Hagag's Non-Compete when it provided employees "instructional guidelines for interacting with [Hagag] in a way that does not violate [his Non-Compete] agreement." (D.E. No.

53-32, Ex. 31 to Gola Decl. at 2–3).  Furthermore, if Hagag could not secure employment outside

the scope of his Non-Compete, the agreement provides that Stryker would compensate Hagag his

full salary and bonus under specific procedures.  (Agmt. § 6.6).

In addition, to evaluate undue hardship, courts also examine whether the non-compete is

overbroad, which involves consideration of three additional factors under the agreement: (i) its

duration; (ii) its geographic limits; and (iii) its scope of prohibited activities.  *Ethicon*, 2021 WL

2206106, at *20 (citing *More*, 869 A.2d at 897).  These factors must be "narrowly tailored to

ensure the covenant is no broader than necessary to protect the employer's interests."  *Id.* at *21;

*Sandhills Glob., Inc. v. Garafola*, No. 19-20669, 2020 WL 1821422, at *10 (D.N.J. Apr. 10, 2020)

(citing *More*, 869 A.2d at 897).

Defendants do not appear to contest the global parameters inherent to Hagag's Non-

Compete.  (*See generally* PI Opp.; *see also* 03/11/22 Tr. at 178:24–179:1).[10]  And although

Defendants question the applicable scope of the Non-Compete, those arguments overlap with

whether a breach likely occurred.  (*See* PI Opp. at 30–33).  Thus, as it relates to whether Hagag's

Non-Compete is overbroad, duration is the only remaining inquiry.  Here, the Court notes that

restrictive covenants of one or two years are commonly upheld as reasonable to protect employers'

legitimate interests.  *22nd Century Techs., Inc. v. iLabs, Inc.*, No. 22-0717, 2022 WL 819668, at

*8 (D.N.J. Mar. 18, 2022) (collecting cases).

The issue of whether Stryker can seek a one-year injunction now, as a remedy under

Section 8.1(b) of the Non-Compete, is the subject of Defendants' partial motion for summary

judgment, which will be addressed in Section III.B of this Opinion.  Regardless of the outcome,

---

[10]    In any event, where, as here, "technological advances in this information age justify broad geographic
restrictions" and the relevant market "is specialized and involves only a few major players that compete globally,"
courts have considered it reasonable for the operative agreement not to have geographical limitations.  *See, e.g.*,
*Ethicon*, 2021 WL 2206106, at *22.

however, Stryker is not entitled to a preliminary injunction for failure to demonstrate irreparable harm, as explained further below.

### iii.    Public Injury

Finally, under the public injury prong, courts consider whether enforcing a non-compete agreement would cause harm to the public. *Ethicon*, 2021 WL 2206106, at *28. Here, the Court finds no potential injury to the public where the parties entered a mutually agreed to contract which does not place a hardship on Hagag, who chose to resign from his position with Stryker. Furthermore, the Court agrees that enforcing the Non-Compete serves the public's interest by promoting stability in the protection of businesses' legitimate interests in their confidential information. (PI Mov. Br. at 25–26 (citing cases)); *see Ethicon*, 2021 WL 2206106, at *23 & *28 (collecting cases).

### b.    Breach

Stryker is likely to succeed on the element of breach under Section 6.3 of Hagag's Non-Compete. (PI Mov. Br. at 8 n.5). Here, there are two avenues that support the likelihood of Hagag's breach. The first concerns robotics. The second concerns AR.

Preliminary, the Court finds that MPO is a "Conflicting Organization" under Hagag's Non-Compete, defined as "any person or organization which ***is engaged in or about to become engaged in*** research on, consulting, regarding, or development, production, marketing, or selling of a Conflicting Product or Service . . . ." (Agmt. § 6.3(a) (emphasis added)). This necessarily requires the Court to determine (i) whether AR assisted surgical technology such as Pixee's goggles is a "Conflicting Product or Service," [11] and (ii) whether MPO "is engaged in or about to become engaged in research on, consulting, regarding, or development, production, marketing or selling

---

[11]    There is no dispute that Hagag's Non-Compete prohibited him from engaging in robotics as a Conflicting Product or Service. (*See* D.E. No. 53-32, Ex. 31 to Gola Decl.; *see also* PI Opp. at 22; 03/11/22 Tr. at 27:21–23).

of" robotics or AR assisted surgical technology.

As it relates to robotics, MPO, jointly with MPSC, engaged in the development of surgical robotics prior to Hagag's arrival. (*See, e.g.*, D.E. No. 53-20, Ex. 19 to Gola Decl. at 1). Although MPO claims to have walled Hagag off from MPO/MPSC's robotics business (*see* PI Opp. at 6–8 & 22), the record suggests that both MPO and MPSC continued to work on robotics. (*See* D.E. No. 66-3, Ex. F to Bendix Decl. (email regarding Microport Robot business subsidiary); D.E. No. 53-36, Ex. 35 to Gola Decl. at 2 (Hagag's 2020 work summary reflecting MPO's successful completion of a 510(k) submission plan with the FDA on behalf of MPO); D.E. No. 53-51, Ex. 48 to Gola Decl. (March 2020 WeChat exchange with Wang)).

Moreover, the Court finds that AR assisted surgical technology, like Pixee's goggles, is a "Conflicting Product or Service," defined as:

> any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which ***resembles, competes with or is intended to resemble or compete with*** a product, process, technology, machine, invention or service upon which [Hagag] . . . worked or about which [Hagag] was knowledgeable during the last twenty-four (24) months of [his] employment with Stryker.

(Agmt. § 6.1 (emphasis added)). Specifically, as demonstrated in the MPO/Pixee pilot program document, MPO "intended" AR assisted surgical technology to "resemble or compete with" robotics. (*See id.*; *see also* D.E. No. 53-47, Ex. 44 to Gola Decl.). The document clearly states that MPO and Pixee sought to "***leverage***" AR assisted surgical technology "***against***        ." (*Id.* at 3 (emphasis added)). Their criteria for inclusion in the pilot program consisted of "***[e]xisting users targeted by*** ▆▆▆/***technology***" and "***[co]mpetitive users targeted by*** ▆▆▆/***technology***." (*Id.* at 4 (emphasis added)). MPO's role in the program involved the recruitment of those users and the ongoing support of those users. (*Id.*). Crucial for purposes of

this case, the success metrics of the pilot program were to be measured by the "*[a]bility to fend-off competitive technology threats (e.g.,* ▮▮▮▮▮ *)."*   (*Id.* (emphasis added)).    Throughout litigation, Defendants made no attempt to address this document.

Defendants did, however, attempt to distinguish MPO's view of AR assisted surgical technology as "complementary" to robotics or as an "alternative" to robotics.  (PI Opp. at 14, 22–23 & 27; 03/10/22 Tr. at 63:5–9).  These arguments fall short and are disingenuous when compared to the totality evidence.  (D.E. No. 53-47, Ex. 44 to Gola Decl.; D.E. No. 53-43, Ex. 40 to Gola Decl. at 43; D.E. No. 53-40, Ex. 39 to Gola Decl. at 4–5; D.E. No. 53-38, Ex. 37 to Gola Decl.; D.E. No. 53-48, Ex. 45 to Gola Decl. at 6; D.E. No. 53-39, Ex. 38 to Gola Decl.).  Although a handheld surgical device coupled with AR goggles is different, physically, from the Mako System (*see* D.E. No. 53-40, Ex. 39 to Gola Decl. at 5), the record demonstrates that MPO intended to position this technology as an equivalent in the marketplace—a product that yields the same (or better) clinical results at a cheaper price to surgeons.  (*Id.*; D.E. No. 53-47, Ex. 44 to Gola Decl.; D.E. No. 53-38, Ex. 37 to Gola Decl.; D.E. No. 53-39, Ex. 38 to Gola Decl.).

Next, the Court must determine whether Hagag's services to MPO (as a Conflicting Organization) "enhance the use or marketability of" robotics or AR assisted surgical technology (as a Conflicting Product or Service) "by application of Confidential Information which [Hagag] . . . had access to during [his] employment."  (Agmt. § 6.3(a)).  Relevant here, "Confidential Information" includes "*know-how*, . . . technical, business and financial information and any other non-public information in any way learned by [Hagag] during [his] employment with Stryker, *including, but not limited* to" information regarding pricing, customers, clients, referral sources, and venders, such as "names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific

information." (Agmt. § 2.2 (emphasis added)). "Confidential Information" also includes "products, **product know-how**, product technology and product development strategies and plans," "forecasts, budgets and other non-public financial information," "expansion plans, management policies and other business strategies," and finally, "inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, engineering, marketing, merchandising, and selling." (*Id.* (emphasis added)).

The Court finds it likely that Hagag used Stryker's "Confidential Information" to assist MPO and/or MPSC's robotics platform. Indeed, the evidence reflects Hagag's discussions of "robotics programs with MPO to assist the efforts of MPO's parent company [MPSC] to develop a competing robotic platform." (PI Mov. Br. at 1–2). For example, Hagag's personal notes in preparation for an upcoming discussion with Wang (MPSC's Chief Operating Officer at the time of Hagag's recruitment) list nearly ten subtopics under the "▮▮▮▮ program" heading, including plans, development status, and expectations. (D.E. No. 53-50, Ex. 47 to Gola Decl.). Hagag drafted these notes in January 2020, even before he assumed his role as MPO's President. (*Id.*).[12]

Tantamount to the Court's finding is the conversation between Wang and Hagag in March 2020 regarding Drs. Buechel. Here, Hagag explains that there is a difference between Dr. Buechel, Jr. and Dr. Buechel, Sr.; however, the Court found Hagag's explanation both unclear and not credible. (03/10/22 Tr. at 195:13–198:19; 03/11/22 Tr. at 44:12–49:11; *see also* PI Opp. at 26). The WeChat messages indicate that Hagag divulged an "**excellent resource**" for the MPO/MPSC "▮▮▮▮ **team**" who "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (D.E. No. 53-51, Ex. 48 to

---

[12]    Although Hagag testified that he did not discuss robotics with Wang during their meeting (*see* 03/10/22 Tr. at 160:11–14), the Court finds his testimony suspect considering his conversation with Wang in March 2020 that explicitly touched on robotics.

Gola Decl. (emphasis added)).  Whether either doctor publicized his work with Stryker is of no moment.  Hagag arranged one or more connections for MPO/MPSC, which likely was the subject of Stryker's Confidential Information, and "**could** [have] enhance[d]" MPO/MPSC's "use or marketability of" robotics.  (*See* Agmt. § 6.3(a) (emphasis added)).

The likelihood of breach is even stronger as it pertains to AR assisted surgical technology.  Here, the Court found Hagag not credible when he testified that he had no knowledge of ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* 03/11/22 Tr. at 9:17–10:4, 29:3–30:21 & 31:19–32:2).  Again, the evidence reflects that Hagag, this time in a conversation with Chen—another MPSC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D.E. No. 53-44, Ex. 41 to Gola Decl. at 1).

Hagag testified that he had no knowledge of ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ instead, he provided multiple "potential" sources of the information he conveyed to Chen, which the Court found not credible.  (03/10/22 Tr. at 151:1–153:10, 155:22–25 & 156:23–25; 03/11/22 Tr. at 41:7–42:17, 77:13–21 & 78:6–13).  Indeed, when pressed by Stryker's counsel, Hagag's memory faded.  (*See* 03/11/22 Tr. at 79:13–17 ("And you were suggesting to your MicroPort colleagues that they look at ▮▮▮▮▮ technology.  Right?" "Potentially.  I can't remember.  He is asking me to go back to February of 2020.  I can't recall that suggestion of February 2020, but it may have been.")).  The Court found Hagag's explanation "convoluted."  (03/11/22 Tr. at 170:12–16).  Thus, it cannot credit Defendants' assertion that this disclosure captured mere public knowledge.  (03/10/22 Tr. at 86:17–23).

Furthermore, and at minimum, the record strongly suggests that Hagag used "know-how," particularly Mako System "product know-how," to MPO and/or MPSC's benefit.  (*See* Agmt. §

2.2).  For approximately sixteen years, Hagag devoted his career to creating, developing, and selling the Mako System.  The amount of intangible "know-how" Hagag possesses with respect to the Mako System is likely irreplicable.  (*See* 03/10/22 Tr. at 107:15–21 ("Hagag was so intimately close to everything about Mako from the early days . . . working with the founders of the company, all the way through the development and successful ramp-up of Mako.  He had access to such critical knowledge about how [Stryker] succeeded in the market, the technology, [Stryker's] customers, how [Stryker] managed very significant challenges in scaling such a big, complex business.")).  Where, as here, a high-level executive is "exposed to a considerable amount of highly sensitive competitive information that is entitled to protection under New Jersey law," courts have found the use of such confidential information "virtually inevitable" where the information will be "relevant to the employee's new role as a high-level executive."  *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 438 (E.D. Pa. 2017) (finding "use of at least some of the confidential information Gregoris learned at Synthes is virtually inevitable, given how much of the information will be relevant—if not outright essential—to effectively performing the role of vice president of sales for Globus's trauma division").  Given MPO's intended positioning of AR assisted surgical technology as competitive to the Mako System, it is inevitable that Hagag leveraged "product know-how" in a way that "could enhance" the technology's use or marketability.  (*See* 03/11/22 Tr. at 145:16–25).  There is also no dispute that—whether intentional or not—Hagag left Stryker with confidential documents that would be, in Kroll's words "akin to somebody having your playbook."  (03/10/22 Tr. at 110:18–19; *see id.* at 120:2–17).

For these reasons, the Court finds that Stryker is likely to succeed on the element of breach.

### 2.      Likelihood of Success on the Merits – Tortious Interference (MPO)

Stryker also seeks a preliminary injunction against MPO for tortiously interfering with

Hagag's Non-Compete.  To bring a claim for tortious interference of a contract under New Jersey law, a movant must establish: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Fid. Eatontown, LLC v. Excellency Enter., LLC*, 16-3899, 2017 WL 2691417, at *5 (D.N.J. June 22, 2017) (quoting *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996)).  The first and last elements are not seriously disputed and are easily met given the facts of this case.  Thus, the issue centers on whether Stryker is likely to establish intentional malice and causation.  The Court believes it will.

"In order to show intentional interference, a plaintiff must demonstrate that the defendant acted with either an intent to interfere with plaintiff's contract right or acted with knowledge that his actions would interfere with the contract right." *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) (citing *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997)).  "Interference is intentional when the 'actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" *Peoplestrategy, Inc. v. Lively Emp. Servs., Inc.*, No. 20-2640, 2020 WL 7869214, at *8 (D.N.J. Aug. 28, 2020) (quoting *Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 575–76 (D.N.J. 2010)).  "[T]he New Jersey Supreme Court has defined malice in this context as not a general ill-will towards the victim, but as intentional interference without justification or excuse." *Mu Sigma, Inc. v. Affine, Inc.*, 12-1323, 2013 WL 3772724, at *4 (D.N.J. July 17, 2013).

First, MPO knew about Hagag's Non-Compete.  And in response to Stryker's explicit concerns and requests for assurances, it ensured Stryker that (i) Hagag would uphold his obligations, and (ii) that MPO ceased all involvement in robotics.  Defendants concede that they never disclosed their involvement in AR assisted surgical technology to Stryker.  (*See, e.g.*,

03/11/22 Tr. at 101:10–17). Yet, in internal documentation, it compares AR goggles to the Mako System using descriptions that clearly indicate MPO's intent to position its product as a competitive alternative to, or replacement for, traditional surgical robotics—a strategy that directly implicates Section 6.1 of Hagag's Non-Compete. (*See, e.g.*, D.E. No. 53-43, Ex. 40 to Gola Decl. at 43; D.E. No. 53-40, Ex. 39 to Gola Decl. at 4–5). Moreover, as described above, the record is replete with inconsistencies regarding the purported firewall in place to prevent Hagag's involvement in MPO or MPSC's robotic business. But-for MPO's concealment, Stryker may not have lost the gain promised to it from Hagag's Non-Compete. Accordingly, Stryker is likely to succeed on its tortious interference claim.

### 3.    Irreparable Harm

Stryker has not shown irreparable harm. The movant has the burden of proving a "clear showing of immediate irreparable injury" absent injunctive relief. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998). "To be entitled to the extraordinary remedy of a preliminary injunction, demonstrating the mere possibility of harm is not enough. Instead, a plaintiff must show an imminent risk of irreparable injury that cannot wait to be redressed until trial is over." *Vita-Pure, Inc. v. Bhatia*, No. 14-7831, 2015 WL 1496396, at *4 (D.N.J. Apr. 1, 2015) (citing *Hynoski v. Columbia Cnty. Redevelopment Auth.*, 485 F. App'x 559, 563 (3d Cir. 2012)). Several months of delay before bringing a motion for a preliminary injunction "can undermine an asserted claim of imminent, irreparable harm." *Id.* (first citing *PTT, LLC v. Gimme Games.*, No. 13-7161, 2014 WL 5343304, *3 (D.N.J. Oct. 20, 2014) (no irreparable harm when plaintiff waited two months before filing suit and eleven months before seeking injunctive relief); and then citing

*Ultimate Trading Corp. v. Daus*, No. 07-4203, 2007 WL 3025681, *3 (D.N.J. Oct. 15, 2017) (no irreparable harm when plaintiff waited three months before filing suit and five months before seeking injunctive relief)).  In addition, the movant must establish that without an injunction, it will suffer harm that cannot be sufficiently redressed after trial.  *See, e.g.*, *Marsellis–Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528 (D.N.J. 1999) (noting that "the word irreparable connotes that which cannot be repaired, retrieved, put down again or atoned for" (cleaned up)).  Thus, "economic loss does not constitute 'irreparable harm.'"  *Id.* at 529.

There are two periods of delay that demonstrate a lack of imminent, irreparable harm in this case.  The first period began approximately two months after Hagag left Stryker.  By April 7, 2020, Stryker knew Hagag had copied or downloaded its confidential information to his Stryker-issued laptop, and that he had copied hundreds of Stryker's files to multiple external storage devices before his departure.  (D.E. No. 53-27, Ex. 26 to Gola Decl. at 1–2).  Stryker then demanded Hagag's external storage devices and additional written assurances, but it did not come to court.  (*Id.* at 2; 03/11/22 Tr. at 186:11–16).  At this time, Stryker agreed that "[a]larm bells were ringing" and that perhaps it "could have rushed to the courthouse."  (03/11/22 Tr. at 185:22–25 & 186:6–7).  Between April 7, 2020, and April 28, 2020, following a forensic exam of Hagag's external devices, iPhone, and iPad, Stryker further learned that (i) one external device had been damaged under suspicious or intentional circumstances, (ii) Hagag's iPhone had been set to automatically delete messages after thirty days, and (iii) Hagag's iPad had been restored to its factory settings.  (D.E. No. 66-4, Ex. M to Bendix Decl.; Kelley Decl.).  Despite these "additional red flags," Stryker did not come to court.  (*See* D.E. No. 66-4, Ex. M to Bendix Decl. at 2).  From May 2020 to July 2020, MPO provided additional assurances while an independent third-party auditor combed MPO and Hagag's files.

The second period of delay began on March 30, 2021, when MPO stopped responding to Stryker's emails.[13] For nearly two months—from March 30 to May 28, 2021—Stryker sat back as MPO stonewalled. (*See* Pls. Supp. Ltr. at 4 (citing D.E. Nos. 93-4, 93-5 & 93-6, Exs. 4–6)). By March 30, 2021, Hagag's one-year Non-Compete already expired and the parties were at an impasse. (*See* D.E. No. 93-6, Ex. 6 (noting, on May 28, 2021, that since ***December 2020***, MPO's "stall tactics and diversions have prevented [the parties] from reaching a final settlement") (emphasis added)).

Stryker admits that revelations it discovered in April 2021 as to SkyWalker's potential penetration into the United States market "cast[ed] doubt on all of Defendants' assurances." (Pls. Supp. Ltr. at 4). Yet, it did not come to court. Instead, it emailed MPO to no avail for over two months. (*See id.*). After Stryker ███████████████████████ on May 28, 2021, it waited two more weeks to file the instant Complaint. (*Id.*). On June 14, 2021, Stryker finally came to court. Even after filing the Complaint, Stryker waited another five months before filing its motion for injunctive relief. "These circumstances belie the notion that any harm to [Stryker] is 'imminent.'" *See, e.g.*, *NASC Services, Inc. v. Jervis*, 07-5793, 2008 WL 2115111, at *6 (D.N.J. May 19, 2008).

The parties' settlement negotiations do not justify Stryker's delay. *See Keybank Natl. Assn. v. Williams*, 20-1384, 2022 WL 402379, at *5 (10th Cir. Feb. 10, 2022) (holding that "it was not unreasonable for the district court to conclude that the duration of the parties' settlement efforts shows that [KeyBank] is not facing imminent and irreparable harm because if it had been, it likely would have immediately sought injunctive relief when it discovered [Appellees'] alleged

---

[13]    The record reflects one non-substantive response to Stryker's March 30, 2021 email indicating that the recipient was "slammed." (D.E. No. 93-4, Ex. 4 at 2). Defendants do not appear to dispute that Stryker's communications between March 30 and May 28, 2021, went unanswered.

wrongdoing and before their restrictive covenants expired") (cleaned up).[14] Here, Stryker admits that the assurances it sought in the initial months of the parties' dispute cannot be considered settlement discussions. (03/11/22 Tr. at 194:13–15). Moreover, even assuming that the pursuit of remedies apart from settlement can justify excusable delay (03/11/22 Tr. at 205:12–206:2 & 211:17–21), Stryker describes markedly different circumstances than a viable path toward resolution: "But at the time we were receiving [a] lot of assurances on [the] one side, and then we are finding alarming things on the other." (03/11/22 Tr. at 187:14–16). For these reasons and others stated on the record during oral argument, this case stands in stark contrast to those in our Circuit that have found excusable delay attributed to settlement negotiations. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004); *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157 (3d Cir. 2000); (03/11/22 Tr. at 212:2–6 & 217:6–218:6).[15]

Finally, although Stryker insists that "an injunction is needed to prevent the ongoing and future harm stemming from Hagag's continued participation in the program," this plea is juxtaposed by its preceding admission that "an injunction cannot remedy the already-suffered harm from Hagag's acceleration of MPO's competing technology efforts." (PI Reply at 13). Stryker's theory is that Hagag *already* used its confidential information to assist MPO, not that he "is poised to use or disclose such information" in the future. *See Ethicon*, 2021 WL 2206106, at *26 (concluding that "though Randall has *not started working for Smith & Nephew*, Randall's use of [p]laintiffs' confidential information in his capacity for Smith & Nephew is imminent and

---

[14]    The timeline of events in *Keybank* is even more confined than the instant case. 2022 WL 402379, at *2 (noting knowledge of possible breach in mid-2019, followed by Keybank's lawsuit in December 2019, and its request for injunctive relief in January 2020).

[15]    Stryker certainly exhibited great patience and, to some respect, collegiality in dealing directly with MPO as a competitor rather than coming to court—particularly during the onset of the COVID-19 pandemic. (03/11/22 Tr. at 210:16–21 & 212:5–8). However, there is no viable excuse for Stryker's patience the follow year, in April and May of 2021, when the parties' impasse was, in the Court's view, crystal clear. Indeed, district courts across the country regularly oversee disputes involving non-compete agreements litigated by cooperative and uncooperative parties that are filed much sooner than the timeline described here.

inevitable" (emphasis added)).  Accordingly, at this juncture, Stryker can seek monetary damages for its loss of business that resulted from "Hagag's acceleration of MPO's competing technology efforts."  (*See* PI Reply at 13; *see also* PI Opp. at 36 (citing cases); 03/11/22 Tr. at 208:4–7 (conceding that "[s]ome of the damages will be quantifiable" and pursued "in terms of direct sales of what [Stryker] view[s] as a tainted product that [MPO] launched with Mr. Hagag")).

### 4.    Harm to the Non-Movants

In balancing the hardships, a court must "ensure that the injunction does not harm the defendants more than denial of the injunction would harm the plaintiff." *Nat'l Reprographics*, 621 F. Supp. 2d at 230.  Hagag and MPO have been restrained under the parties' stipulated preliminary injunction for over a year, which weighs in their favor.  However, had Defendants disclosed their involvement in AR assisted surgical technology that they intended to be comparable or competitive to the Mako System, this case may have had a different trajectory.  *See Heartland Payment Sys., LLC v. Volrath*, 21-75323, 2017 WL 6803519, at *9 (D.N.J. Dec. 31, 2017) ("[C]ourts are not sympathetic to employees who bring hardships upon themselves."), *aff'd*, 762 F. App'x 95 (3d Cir. 2019).  Nor is there evidence in support of Defendants' argument that an injunction would force MPO to terminate Hagag or abandon "entire technologies" it views as uncompetitive.  (PI Opp. at 38–39).  Accordingly, the Court finds that harm to the non-movants is weak or neutral at best.

### 5.    Public Interest Factor

Finally, the public interest factor "instructs courts to consider the fact that enforcement of the restriction should not cause harm to the public."  *ADP, LLC v. Pittman*, No. 19-16237, 2019 WL 5304148, at *17 (D.N.J. Oct. 18, 2019) (internal quotations omitted).  Akin to *Ethicon*, "the Court discerns no major public component involved in a preliminary injunction, because nothing

in the record indicates" that enforcement of Hagag's Non-Compete "may diminish the rights of the public to have free access to a particular type of good or service." 2021 WL 2206106, at *28 (citing *Pittman*, 2019 WL 5304148, at *17). The Court also recognizes the public's interest in the judicial enforcement of non-compete agreements, which promotes "stability and certainty in business and employment relationships." *Id.* (citing *Strom*, 621 F. Supp. 2d at 230). Certainly, the public has an interest to ensure that confidential business information remains protected because its use for unfair competition is ill-advised. *Id.* Thus, the public interest weighs in Stryker's favor.

Notwithstanding the above, Stryker's motion for injunctive relief fails on the gateway factor of irreparable harm. *See, e.g.*, *Reilly*, 858 F.3d at 179.

### B.    Defendants' Motion for Partial Summary Judgment

The Court turns to Defendants' motion for partial summary judgment on the term of Hagag's Non-Compete. Relevant here, Hagag agreed to three provisions for a twelve-month period following his departure from Stryker: (i) the non-solicitation of customers provision; (ii) the non-compete provision; and (iii) the non-solicitation of employees provision. (Agmt. § 6.2, 6.3 & 6.4). Hagag's Non-Compete further provides "that the period during which Sections 6.2, 6.3 or 6.4 apply to [Hagag] *will be deemed to be extended by one (1) day for each day that [Hagag] [is] in breach* of Section 6.2, Section 6.3 and/or Section 6.4 of this Agreement[.]" (Agmt. § 8.1(b) (emphasis added)). There is no dispute that, assuming Hagag's compliance, his restrictive term is one year.

Defendants argue that the plain language of Hagag's Non-Compete provides a maximum restrictive obligation of two years, or until February 2022, assuming Hagag breached the Non-Compete for one year following his departure from Stryker. (SJ Mov. Br. 2–4; *see* PI Opp. at 17–

21).[16]  Stryker disagrees.  Assuming Hagag breached for the entire twelve-month period, it argues that Section 8.1(b) extends Hagag's obligations indefinitely until he stops breaching.  Stryker supports this claim through Section 8.1(b)'s language that Hagag's obligations are "extended"— in other words, that they continue—"by one (1) day for each day" Hagag is in breach.  (Agmt. § 8.1(b)).  Stryker argues that Hagag has been in continuous breach of his Non-Compete from February 2020 to the present.  (SJ Opp. at 5; *see* PI Mov. Br. at 32).  Thus, Stryker asks the Court to determine a future date in which Hagag ceases this breach, at which point Hagag must comply with his restrictive obligations for one-year.  (*See* 03/10/22 Tr. at 16:6–10).

It is undisputed that New Jersey contract law governs Hagag's Non-Compete.  Under New Jersey law, contracts should be construed according to their plain and ordinary meaning.  *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 154 (D.N.J. 2013); *Shafer v. United Gen. Title Ins. Co.*, No. 08-2884, 2009 WL 2058524, at *4 (D.N.J. July 8, 2009) (collecting cases).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."  *Bohler–Uddeholm, Inc. v. Ellwood Group*, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted).  A court may examine extrinsic evidence to interpret whether the provision in dispute is ambiguous.  *Shafer*, 2009 WL 2058524, at *4.  "Such evidence may 'include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'"  *Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) (quoting *Kearny PBA Local # 21 v. Town of Kearny*, 405 A.2d 393 (N.J. 1979)).

---

[16]    Assuming a breach occurred, Defendants concede that their interpretation would entitle Stryker to damages for a maximum period of two years.  (SJ Mov. Br. at 2; *see* 03/11/22 Tr. at 228:9–16; *see also* 03/10/22 Tr. at 13:12–15, 15:4–9 & 19:16–21).

A contract is ambiguous if it is "susceptible of more than one meaning." *Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996); *CPS MedManagement LLC*, 940 F. Supp. 2d at 155; *Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992). Ambiguities are resolved by a jury. *Ord. of St. Benedict of New Jersey v. Gianforcaro*, No. A-1158-16T3, 2018 WL 3596282, at *7 (N.J. Super. Ct. App. Div. July 27, 2018) (citing *Michaels v. Brookchester, Inc.*, 140 A.2d 199, 204 (N.J. 1958)). However, a court may not read or enforce contractual provisions in a way that "write[s] a different or better contract for the parties." *Textron Fin.-New Jersey Inc. v. Herring Land Grp., LLC*, No. 06-2585, 2012 WL 1079613, at *16 (D.N.J. Mar. 30, 2012) (quoting *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002)); *E. Brunswick Sewerage Auth. v. E. Mill Associates, Inc.*, 838 A.2d 494, 497 (N.J. Super. Ct. App. Div. 2004). Thus, the Court cannot fashion an ambiguity where none exists. *CPS MedManagement LLC*, 940 F. Supp. 2d at 154 (citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999)).

Under the Non-Compete, Hagag's restrictive obligations run for a maximum period of twelve months—or one year—"after the termination of [Hagag's] employment with Stryker." (Agmt. §§ 6.2, 6.3 & 6.4). As applied to the facts here, Hagag's obligation to Stryker began on February 1, 2020, and culminated on February 1, 2021. Thus, even before reaching Section 8.1(b) and apart from Hagag's conduct, the period in which Hagag could have breached necessarily began on February 1, 2020, and ended on February 1, 2021. Section 8.1 provides Stryker remedies in the event Hagag breached during the twelve-month restrictive period. Relevant here, it states that "the period" specifically set out in "Sections 6.2, 6.3, or 6.4 . . . will be deemed to be extended by one (1) day for each day that [Hagag is] in breach of Sections 6.2, 6.3, or 6.4." (Agmt. § 8.1(b)).

45

When these provisions are read together and in context, Section 8.1(b) may extend Hagag's obligations for a maximum period of twelve months—one day for each day of a twelve-month breach. *See, e.g., Epstein v. Wilentz, Goldman & Spitzer, P.A.*, No. A-1157-14T1, 2015 WL 9876918, at *4 (N.J. Super. Ct. App. Div. Jan. 22, 2016) ("Contract provisions are to be read as a whole, without artificial emphasis on one section, with a consequent disregard for others." (internal quotations omitted)); *Borough of Princeton v. Bd. of Chosen Freeholders of Cty. of Mercer*, 755 A.2d 637, 645 (N.J. Super. Ct. App. Div. 2000) (noting that "[l]iteralism must give way to context").

First, the Non-Compete contains no provision that supports Stryker's interpretation that would extend the clock in perpetuity, unless and until Stryker asserts its rights. Second, absent from the Non-Compete is any reference to "tolling"—a term of art used in the briefing that would more clearly support Stryker's interpretation of Section 8.1(b). (*See* 03/10/22 Tr. at 10:16–11:3; SJ Mov. Br. at 6). Unlike cases cited by the parties, Hagag's Non-Compete does not contain an explicit "tolling" provision. (SJ Mov. Br. at 8 & n.3); *see, e.g., Lynch*, 2019 WL 1450749, at *3 (providing that "[t]he restricted time periods . . . above ***shall be tolled*** during any time period that [defendant is] in violation of such covenants, as determined by a court of [competent] jurisdiction, so that ADP may realize the full benefit of its bargain. ***This tolling shall include any time period during which litigation is pending*** . . ." (emphasis added)); *see also Pittman*, 2019 WL 5304148, at *7 (same); *Kusins*, 215 A.3d at 932 (same).[17] The Court cannot rewrite the Non-Compete to include a tolling provision. *See Jackson Hewitt, Inc. v. Barnes Enterprises*, No. 10-05108, 2012 WL 1600572, at *4 (D.N.J. May 7, 2012) (finding that the non-compete clause commenced on the

---

[17]    Indeed, a sophisticated party like Stryker could have included an explicit tolling provision in Hagag's Non-Compete. *See Gaylord Broad. Co. v. Cosmos Broad. Corp.*, 746 F.2d 251, 253 (5th Cir. 1984) ("The parties may contractually provide for the tolling of the noncompetition period, if an employee breaches a covenant not to compete and the resulting civil proceedings to enforce the covenant consume more time than the period of the covenant itself.").

date in which the former franchisee terminated the franchise and declining to "[e]nforc[e] a two year non-compete agreement from the date of th[e] [c]ourt's [o]rder" because such an outcome "would constitute an unwarranted extension of the Franchise Agreement's terms").

Third, Stryker's interpretation of the restrictive period could render the Non-Compete unreasonable. *See, e.g.*, *More*, 183 N.J. at 63 (finding "no justification to extend the [non-compete] agreement beyond [its two-year restrictive] period" because "restrictive covenants are not favored in the law"). Under Stryker's view, Hagag's restrictive covenants would extend indefinitely—or at least until Stryker elects to assert its rights. Furthermore, it is unlikely that enforcement of the one-year restriction from the date of this Opinion is "necessary to protect [Stryker's] confidential, proprietary, or secret information." *See Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008) (finding "no justification to extend the prohibition on competition beyond the contractual period based on litigation delay").[18]

Fourth, Stryker's interpretation of the non-compete presents difficult manageability concerns. Under Stryker's interpretation, the factfinder is required to microscopically analyze the days on which Hagag breached to determine how many days Hagag's obligations extend. A wholistic view of breach provides a more manageable standard.

Taken together, the Court does not read Section 8.1(b) as potentially extending the clock on Hagag's obligations in perpetuity. That result was not the benefit of the parties' bargain. Accordingly, Hagag's obligations under the Non-Compete ended, at the latest, on February 1, 2022.

---

[18]    Stryker's contention that Defendants' motion for partial summary judgment "comes too early" because "discovery still is ongoing" is disingenuous. (*Compare* SJ Opp. at 12, *with* 03/11/22 Tr. at 233:12–23 (The Court: "Assuming that I get past my concerns for irreparable harm, how can I grant you what you're seeking in terms of this injunction without making a legal call as to the issue of [the] tolling extension. . . . Don't we have to resolve that as a matter of law?" Mr. Wilson: "I agree, your Honor. Ms. Amalfe was just pointing this out to me, that you are going to reach that issue.")).

Apart from Section 8.1(b), the Court is not persuaded by Stryker's argument on equitable tolling, particularly for the reasons set forth above regarding Stryker's delay in seeking judicial intervention. (SJ Opp. at 6–12; PI Mov. Br. at 32–33; PI Reply at 10–11; 03/10/22 Tr. at 15:12–14, 23:11–17, & 25:7–8). *Matthews International Corporation v. Lombardi*, 2021 WL 732722 (W.D. Pa. Feb. 21, 2021) is inapposite. Unlike this case, the plaintiff in *Matthews* did not learn of Mr. Esposito's misconduct, which had been occurring for years, until *after* it filed suit against different defendants. *Id.* at \*3. Plaintiff added Mr. Esposito as a defendant shortly thereafter, less than one year from the filing of its original complaint. *Id.* at \*2. And while plaintiff initially permitted Mr. Esposito to work for a competitor, the court found that plaintiff—unlike Stryker— "was not aware that Mr. Esposito was ***taking*** and using its confidential and trade secret information." *Id.* at \*15 (emphasis added). Consequently, the court in *Matthews* found that plaintiff did not reasonably know of Mr. Esposito's misconduct *prior to* its lawsuit against the original defendants.

The facts in *Matthews* bear no comparison to the months-long discussions and, ultimately, the stonewalling Stryker tolerated before filing this lawsuit. Furthermore, none of the cases Stryker cites (*see, e.g.*, SJ Opp. at 8) involve the magnitude of delay or facts that give rise to suspected non-compete violations which are before this Court. Even in a light most favorable to Stryker, Defendants' conduct, however egregious, cannot be viewed in isolation. (*Compare id.* at 11 (blaming "Defendants' actions" for "the timing of this case"), *with id.* at 10 (admitting that Stryker had "threatened litigation" as early as May 2020, thirteen (13) months before filing this lawsuit and nearly eighteen (18) months before filing its motion for a preliminary injunction)); *see, e.g.*, *Economics Laboratory, Inc. v. Donnolo*, 612 F.2d 405, 408 (9th Cir. 1979) ("The application for an injunction was first made on February 28, 1977, and by that time the one-year

period, in the agreement executed by defendants, had expired [more than five months earlier]. The District Court should on that ground have denied the injunction sought.").[19]    These points are buttressed by Stryker's admission that "an injunction cannot remedy the already-suffered harm from Hagag's acceleration of MPO's competing technology efforts." (PI Reply at 17).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is **DENIED**. Defendants motion for partial summary judgment is **GRANTED**.    An appropriate Order accompanies this Opinion.


**Dated:** June 30, 2022                                          *s/Esther Salas*
                                                       **Esther Salas, U.S.D.J.**


---

[19]    This case is distinguishable from a non-binding, out-of-circuit case Stryker cites in opposition (SJ Opp. at 7, n.6), which involves a nearly identical provision.  *See Amedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, No. 14-1357, 2015 WL 1912308, at *2 (D. Kansas) (providing that the "[e]mployee hereby agrees that the applicable period of restriction shall be extended by one day for each day the [e]mployee is to have been in violation of such restriction up to, but not to exceed, a length of time that is equal in length to the period of restriction that would have applied absent the violation").

In *Amedisys*, the employee was subject to a one-year restrictive covenant, which ended on March 24, 2015, one year from the employee's termination date. *Id.* at *2 & 6.  Plaintiffs filed a lawsuit on or before March 23, 2015—the date of the court's last hearing on their motion for a preliminary injunction. *Id.* at *6.  Plaintiffs requested to extend the employee's covenant for seven months—the time they believed he had been in breach during the one-year restrictive period. *Id.*  The court found plaintiffs' calculation reasonable and ordered the employee's compliance with his restrictive covenants for seven months starting on March 23, 2015, the day of the last hearing. *Id.*  This date, however, coincided with the eve of the non-compete's natural expiration date.  It is unclear whether the *Amedisys* court would have reached the same outcome if the hearing had occurred more than two years after the agreement's one-year expiration, as it did in this case.  Thus, the specific facts and circumstances here do not warrant an equitable extension. *See Ocean Beauty Seafoods, LLC v. P. Seafood Group Acq. Co., Inc.*, 648 F. App'x 709, 712 (9th Cir. 2016) ("And unlike the employer in *Economics Laboratory, Inc. v. Donnolo*, 612 F.2d 405, 408 (9th Cir.1979), Pacific Seafood acted promptly to enforce its rights.").